UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CHRISTINE A. SEAVERS,<br><br>    Plaintiff,<br><br>    v.<br><br>ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 1:20-CV-358 JD |

## OPINION AND ORDER

Plaintiff Christine Seavers appeals the denial of her claim for disability insurance benefits. The ALJ had denied her claim after determining she was not disabled but, for the reasons explained below, this determination requires a remand for further consideration.

**A.     Factual Background**

In October 2017, Ms. Seavers applied for disability insurance benefits, claiming that, by July 24, 2017, she had become unable to work due to her health conditions. At the time, she was 48 years old. In her application, Ms. Seavers primarily alleged that she was disabled due to back injury and leg pain. Her case was heard and reviewed by an Administrative Law Judge, who issued a decision on September 3, 2019, finding Ms. Seavers not disabled under 42 U.S.C. §§ 216(i) and 223(d).

According to the medical evidence, Ms. Seavers has longstanding back problems. In October 2011, she had back surgery (R. at 798 (list or surgeries)), and subsequently was able to work. In mid-2016, she again began suffering back pain along with leg pain. Over the next

twelve months, she saw medical providers nearly a dozen times concerning her back and legs, but it appears that the pain was sufficiently controlled, allowing her to work.

On July 7, 2017, Ms. Seavers was involved in a car accident which caused her pain to worsen (R. at 256, 448), and she claims she became disabled on July 24 when she was no longer able to work due to back and leg pain.

Two months later, in September 2017, Ms. Seavers underwent back surgery: right L2 partial hemilaminectomy,[1] facetectomy,[2] and removal of disk and ligament. (R. at 463.) After the surgery, her leg pain had improved, but she continued to have numbness and weakness. (R. at 456.) She was recommended to try physical therapy. (*Id*.)

In March 2018, Dr. Parker evaluated her for disability determination. Parts of his report are self-contradictory. He opined that Ms. Seavers could walk for 1/5 of a block, stand for 5 minutes, climb two stairs, and lift no more than 5 pounds. (R. at 491.) However, he also opined that she could stand or walk for at least 2 hours in an 8-hour day, lift or carry less than 10 pounds frequently or more than 10 pounds occasionally. (R. at 496.) He also noted normal muscle stretch and tone, no atrophy, normal gait, and normal strength. (R. 495–497.)

In April 2018, Ms. Seavers began receiving medical care at Matthew 25 clinic. (R. 510). The treating doctor's notes show that she complained of some lumbar pain and right leg numbness, tingling, and pain. (R. at 510). "She stated her pain is doing better since the surgery."

---

[1] "A hemilaminectomy is a spine surgery that involves removing part of one of the two laiminae on a vertebra to relieve excess pressure on the spinal nerve(s) in the lumbar spine, or lower back. A hemilaminectomy can be performed to relieve symptoms such as back pain and radiating leg pain." The American Center for Spine and Neurosurgery, https://www.acsneuro.com/lumbar-spine-surgeries/metrx-minimally-invasive-hemilaminectomy (last visited February 11, 2022).

[2] "A lumbar facetectomy is a surgical procedure to relieve the pressure on the nerve roots that pass close to the facet joints of the lumbar spine in the low back. During a lumbar facetectomy the surgeon partially or entirely removes the affected facet joints in the lumbar region of the spine." MedicineNet, https://www.medicinenet.com/what_is_a_lumbar_facetectomy/article.htm (last visited February 11, 2022).

(*Id*.) She was prescribed medication and referred to physical therapy. While the physical therapy appeared to show some improvement initially, medical notes from August 2018 state that she had finished physical therapy with little improvement. (R. at 581.)

By October 2018, Ms. Seavers was complaining of severe low back pain. (R. at 610.) She underwent an MRI scan on October 31, 2018. As relevant, the MRI reading discusses the difficulty to identify disc protrusion versus scar tissue in the L2/L3 vertebrae and notes some degenerative changes:

> . . . Moderate broad-based central right paracentral soft tissue, which may represent disc material and/or scar tissue, similar in size to previous although the more focal component in the right lateral recess on prior study is currently slightly smaller. Without IV contrast it is difficult to determine the degree of disc protrusion versus scar tissue. Ligamentous/facet hypertrophy with mild left foraminal encroachment unchanged. Mild left lateral recess stenosis is improved. Moderate type I endplate degenerative changes, mildly progressed since prior MRI, without fluid in the disc space to suggest discitis. 5 mm of retrolisthesis unchanged.

(R. at 797.)

In November 2018, Ms. Seavers was referred to pain management physician, Dr. Austin, who assessed her pain to be consistent, among other things, with failed back syndrome of lumbar spine,[3] lumbar radiculopathy,[4] chronic pain syndrome, lumbar spinal stenosis,[5] and lumbar

---

[3] "Failed back surgery syndrome (FBSS) is defined by the International Association for the Study of Pain as 'lumbar spinal pain of unknown origin either persisting despite surgical intervention or appearing after surgical intervention for spinal pain originally in the same topographical location.'" Failed Back Surgery Syndrome, https://www.ncbi.nlm.nih.gov/books/NBK539777/ (last visited February 9, 2022).

[4] "A radiculopathy is caused by compression, inflammation and/or injury to a spinal nerve root in the low back." Spine Health, https://www.spine-health.com/conditions/lower-back-pain/lumbar-radiculopathy (last visited February 11, 2022).

[5] "Lumbar spinal stenosis is a narrowing of the spinal canal in the lower part of your back. Stenosis, which means narrowing, can cause pressure on your spinal cord or the nerves that go from your spinal cord to your muscles." John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/lumbar-spinal-stenosis (last visited February 11, 2022).

spondylosis.[6] (R. at 801.) He prescribed physical therapy, weight management, stopping smoking, and continued medications. (*Id.*) As of February 2019, Ms. Seavers had not started physical therapy or weight management and had not stopped smoking.[7] (R. at 819.) She was still complaining to medical providers of severe back pain as of April 2019. (DE 829.)

Meanwhile, returning to March and May 2018, at about the midpoint between Ms. Seavers's surgery in September 2017 and her MRI in October 2018, State Agency physicians Dr. Eskonen and Dr. Corcoran, respectively, reviewed her medical evidence. Dr. Eskonen opined that Ms. Seavers could perform light work (R. at 77) limited to occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling. She could not climb ladders/ropes, scaffolds, and she must avoid concentrated exposure to hazards. (R. at 78–79.) Dr. Corcoran's opinion is essentially the same. (R. at 90–92.) Both doctors noted that the lumbar spine surgery improved Ms. Seavers's health. Dr. Corcoran also noted that, although Ms. Seavers had become less active, there were "no changes or new issues." (R. at 92.)

On September 3, 2019, the ALJ issue her decision on Ms. Seavers's application for disability insurance benefits. She found that Ms. Seavers suffers from several severe impairments, namely, degenerative disc disease of the lumbar spine status post surgery, with radiculopathy; degenerative joint disease of the SI joint; asthma; and obesity. (R. at 20.) The ALJ then found that none of these impairments or combination of impairments was equal in severity to the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20–21.) The ALJ

---

[6] "Spondylosis is age-related change of the bones (vertebrae) and discs of the spine. These changes are often called degenerative disc disease and osteoarthritis. These changes don't always cause symptoms. But they are a common cause of spine problems that can range from mild to severe." University of Michigan Health, https://www.uofmhealth.org/health-library/abr8401 (last visited February 11, 2022).

[7] The record does not reveal the reasons for why Ms. Seavers failed to begin her treatments, but there are records indicating that by that time she no longer had medical insurance.

next concluded that Ms. Seavers had the residual functional capacity ("RFC") for light work as defined in 20 C.F.R § 416.967(b) with the following limitations:

> [T]he claimant can occasionally climb stairs or ramps, balance, stoop, kneel, crouch, or crawl; and can never climb ladders, ropes, or scaffolds. The claimant must avoid concentrated exposure to unprotected heights, fumes, dusts, odors, gases, and poor ventilation

(R. 20.) Determining that Ms. Seavers could perform her past relevant work as a roll mold machine operator, the ALJ found that Ms. Seavers was not disabled.[8] (R. 24–25.) The ALJ further found that Ms. Seavers was able to perform the work as a cashier, a fast food worker, and housekeeper. Ms. Seavers requested a review by the Appeals Council, which was denied, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. § 405(g).

**B.     Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

---

[8] The finding that Ms. Seavers could perform her past work is inconsistent with undisputed evidence. At the hearing before the ALJ, Ms. Seavers testified about what her job entailed. The Vocational Expert listened to her testimony and classified her job as "blow-molding machine operator." The ALJ asked him a hypothetical question as to whether someone with Ms. Seavers's age and education who had done Ms. Seavers's job would be able to return to work within the parameters of Ms. Seavers's RFC. The Vocational Expert answered that such person would be able to do the job as it is defined by the Dictionary of Occupational Titles but would not be able to do the job as Ms. Seavers actually did it:
>   ALJ: . . . Could such a hypothetical individual perform any of the Claimant's past work?
>   VE: Excuse me. As indicated by DOT, the blow-molding machine operator, Your Honor.
>   ALJ: Okay.
>   VE: But as testified to, no.
>   ALJ: Okay. So if I understood you correctly, it's per the DOT but not as she did it?
>   VE: Based upon my understanding her testimony. Correct.
>   (R. at 65.)

Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

### C. Standard for Disability

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

6

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs

in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**D.     Discussion**

Ms. Seavers argues that the ALJ's decision should be remanded for two reasons. First, she argues that the ALJ erred in finding that she was able to perform "light work" by relying on stale opinions of the State Agency physicians that were not supported by substantial evidence. Ms. Seavers agrees that, after her back surgery in September 2017, her lower back and leg pain were improving until mid-2018, as is reflected in the State Agency physicians' opinions. However, she claims that her condition worsened in the second half of the year, which is corroborated by the October 31, 2018, MRI. She insists that the ALJ should have resubmitted her case to the State Agency physicians in light of the new medical findings.

The Court agrees with Ms. Seavers that the MRI and the subsequent medical records indicating failed back syndrome of lumbar spine constituted substantial evidence that should have been provided to the State Agency physicians. The Agency concedes that "[t]he ALJ's findings as to [Ms. Seavers's] functional limitations were based on the opinions of Drs. Eskonen and Corcoran." (DE 28 at 6.) The Agency also acknowledges that "'[a]n ALJ must not rely on a physician's assessment "if later evidence containing new, significant medical diagnoses reasonably could have changed" the physician's views." (*Id.* (citing *Pavlicek v. Saul*, 994 F.3d 777, 783–84 (7th Cir. 2021).) Yet, the Agency insists that the State Agency physicians already knew that Ms. Seavers had a severe medical condition and the later records corroborated their conclusions. (*Id.*) This argument is unavailing.

8

On review, there's no telling whether the later medical records corroborate the opinions of the State Agency consultants or call them into question. The ALJ herself recognized that Drs. Eskonen and Corcoran "did not have [the] benefit of reviewing evidence that was available at the hearing level." (R. at 24.) Among these records were the October 2018 MRI and subsequent diagnosis of the failed back syndrome. The latter suggests a worsening of Ms. Seavers's condition after the State Agency consultants reviewed the record, so it cannot be said that they already knew the full extent of Ms. Seavers's ailments. As for the MRI, the Agency submits that it did not reveal any new or complex medical problems as argued by Ms. Seavers. In fact, the Agency suggests that the MRI findings were consistent with earlier findings and thus do not constitute "new significant medical diagnoses;" . . . "[r]ather, the MRI showed no significant or unexpected changes. It did not constitute evidence of any new medical problem in addition to her existing back problems." (DE 28 at 7.)

The Agency's argument is inviting the Court to "play doctor." This Court is not qualified to make medical diagnoses, nor are the lawyers representing the Agency. *Cf. McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) ("An ALJ may not conclude, without medical input, that a claimant's most recent MRI results are "consistent" with the ALJ's conclusions about her impairments."). The MRI must be interpreted by those trained in the art, not judges or lawyers. This case is unlike *Deloney v. Saul*, 840 F. App'x 1, 5 (7th Cir. 2020), where the court could assess the meaning of the range of motion measurements taken at several doctor visits. In that case, plaintiff contended that the measurements taken over a period of time showed a worsening of her condition, but the court could tell that "these measurements did not differ from those taken [earlier] when [plaintiff's] pain was effectively managed and she could perform physical activities normally." *Id*. As a result, "[b]ecause of the consistency between the measurements,

the [latest] measurements [did] not constitute 'new, significant medical diagnoses' that would make reliance on previous exams improper." *Id*. Yet, in Ms. Seavers's case, the Court is unable to determine whether the MRI results constitute a new, significant medical diagnoses. The references in the MRI study to possible "disc protrusion versus scar tissue" and "moderate type I endplate degenerative changes" as well as the improved "mild left lateral recess stenosis," and so on, must be interpreted by the professionals. This is especially true because the same reading is accompanied by the diagnosis of the failed back syndrome, which suggests that the surgery failed to control Ms. Seavers's pain. Simply stated, the Court cannot accept the agency argument that the newer medical evidence would not have made any difference had it been available to the State Agency consultants. Accordingly, this case requires a remand to the ALJ for further consideration.

As to the second reason for remanding this case, Ms. Seavers argues that the ALJ erred in dismissing the opinion of an independent examining physician, Dr. Parker, who found that she could only walk half a block, stand for 5 minutes, or climb 2 stairs before needing to rest and could lift or carry no more than 5 pounds of weight. (*See* R. at 491). But that was not Dr. Parker's only finding. He also found that Ms. Seavers could stand or walk for at least 2 hours in an 8-hour day, lift or carry less than 10 pounds frequently or more than 10 pounds occasionally. (R. at 496.) He also noted she had normal muscle and stretch tone, no atrophy, a normal gait, and normal strength. (R. at 495–97.) These findings are internally inconsistent and justifiably unpersuasive. When an ALJ considers medical opinions, among the most important factors are supportability and consistency, 20 C.F.R. § 404.1520c(b)(3–5) ("The factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings

to be."), and, on its face, Dr. Parker's opinion is lacking in both areas. In the same opinion, Dr. Parker presents Ms. Seavers as both barely able to stand and able to stand for 2 hours in an 8-hour workday. Also, in one part of the opinion she is described as not being able to lift or carry more than 5 pounds but elsewhere the opinion states she can lift and carry less than 10 pounds frequently and more than 10 pounds occasionally. Furthermore, Dr. Parker's opinion is unsupported by his own examination where he observed normal muscle stretch and tone, no atrophy, normal gate and strength. Accordingly, Ms. Seavers's contention that the ALJ erroneously dismissed Dr. Parker's opinion does not present a sufficient basis for remand.

### E.     Conclusion

On the basis of the foregoing, the Court **REVERSES** the Agency's decision and **REMANDS** this matter to the Agency for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: February 14, 2022

/s/ JON E. DEGUILIO
Chief Judge
United States District Court